IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

_____

| | |
|---|---|
| JAMES GONDECK and PETER G. O'MALLEY, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )    No. 11-cv-6341 |
| | ) |
| | )    JURY TRIAL DEMANDED |
| A CLEAR TITLE AND ESCROW EXCHANGE, | ) |
| LLC, STEPHEN J. CORMIER, FIDELITY | ) |
| NATIONAL TITLE GROUP d/b/a   CHICAGO | ) |
| TITLE INSURANCE COMPANY and TICOR | ) |
| TITLE, SRV ASSOCIATES, LLC., THE LUX | ) |
| GROUP, LLC., SRV HOLDINGS & | ) |
| ASSOCIATES, LLC, MAREK R.V. HARRISON, | ) |
| MICHAEL SPIES, BANK OF AMERICA CORP. | ) |
| And FIFTH THIRD BANKCORP, | ) |
| | ) |
| Defendants. | ) |

## **COMPLAINT**

NOW COME Plaintiffs, JAMES GONDECK ("Gondeck") and PETER G.
O'MALLEY ("O'Malley")(collectively referred to as "Plaintiffs"), through their
undersigned attorneys and for their complaint against Defendants, A CLEAR TITLE
AND ESCROW EXCHANGE ("A Clear Title"), STEPHEN J. CORMIER ("Cormier"),
FIDELITY NATIONAL TITLE GROUP d/b/a CHICAGO TITLE INSURANCE
COMPANY and/or TICOR TITLE ("Fidelity"), SRV ASSOCIATES, LLC ("SRV
Associates"), THE LUX GROUP, LLC ("Lux Group"), SRV HOLDINGS &
ASSOCIATES, LLC ("SRV Holdings"), MAREK R.V. HARRISON ("Harrison"),

MICHAEL SPIES ("Spies"), BANK OF AMERICA CORP. ("Bank of America") and FIFTH THIRD BANCORP ("Fifth Third") state as follows:

## PARTIES

1.      Plaintiff Gondeck is an Illinois citizen residing in Lake Zurich, Illinois located in the Northern District of Illinois.

2.      Plaintiff O'Malley is an Illinois citizen residing in DeerPark, Illinois located in the Northern District of Illinois.

3.      Defendant A Clear Title is a Florida corporation with its principal place of business located at 901 Venetia Bay Blvd., Venice, Florida, 34285.  At all relevant times, A Clear Title was licensed as a title insurance and escrow agency in Florida.

4.      Defendant Cormier is a citizen of Florida.  At all relevant times, Cormier was a Managing Member and Registered Agent of A Clear Title.

5.      Defendant Fidelity is a Delaware corporation with its principal place of business located at 601 Riverside Ave., Jacksonville, Florida 32204.  Fidelity is one of the largest providers of title insurance and escrow services.  Fidelity's leading title brands include Chicago Title Insurance Company and Ticor Title.  Fidelity, through Chicago Title Insurance Company and/or Ticor Title or both, appointed A Clear Title as its agent in Florida.

6.      Defendant SRV Associates is a Florida corporation with its principal place of business located at 5003 Elberon St., Tampa, Florida 33611.  SRV Associates was the initial Managing Member and equity shareholder of SRV Holdings.

7.      Defendant Lux Group is a Florida corporation with its principal place of business located at 5003 Elberon St., Tampa, Florida 33611.  Lux Group is a Manager of SRV Associates.

8.      Defendant SRV Holdings is a Florida corporation with its principal place of business located at 607 S. Alexander St., Suite 200, Plant City, Florida 33563.  SRV Holdings was formed to provide, among things, the management and operation of a Resort Hotel and all related services, including but not limited to Administration, Marketing, Sales, Leasing, Renting and others.

9.      Defendant Harrison is a citizen of Florida.  At all relevant times, Harrison was, upon information and belief, an owner and/or manager of SRV Associates, Lux Group and SRV Holdings.

10.     Defendant Spies is an Illinois citizen.  At all relevant times, Spies was a Home Loan Manager in the Retail Mortgage Sales Department for Bank of America.

11.     Defendant Bank of America is Delaware corporation with its principal place of business located at 214 North Tryon St., Charlotte, North Carolina 28202.  At all relevant times, Bank of America operated a branch located at 1356 S. Milwaukee Ave. Libertyville, Illinois where Spies was employed.

12.     Defendant Fifth Third is an Ohio corporation with its principal place of business located at 38 Fountain Square Plaza, Cincinnati, Ohio 45263.  At all relevant times, A Clear Title maintained an escrow account at Fifth Third.

## JURISDICTION AND VENUE

1.      Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1331; 18 U.S.C.§ 1964 (c); Section 22 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §

77v(a); and Section 21(e) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78u(e).

2.          Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b)(2);18 U.S.C. § 1965(a); 15 U.S.C. § 77v(a); and 15 U.S.C. §78u(e).

## FACTUAL ALLEGATIONS

**The Fraudulent Scheme**

3.          Defendants either participated in or aided and abetted a concerted scheme that defrauded Plaintiffs, and others presently unknown to these Plaintiffs, of at least $500,000.

4.          Pursuant to this fraudulent scheme, Defendants identified individuals who were looking to find funding sources for real estate projects and/or to profit from investing in real estate projects.

5.          After identifying appropriate individuals, Defendants described a purported Real Estate Funding Program ("Program") whereby the participants, including, but not limited to, Plaintiffs, essentially were told that if they deposited in escrow approximately ten percent (10%) of the transaction dollar amount needed for the real estate project, a letter of credit would be issued and the letter of credit would be used to fund a project line of credit.  Alternatively, participants were told that the money deposited in escrow would be used as proof of funds to purchase a bank guarantee, which would then be 'monetized,' and the money from the 'monitization'  would be used to fund the projects.

6.          Regardless of the source of funding, which sometimes varied depending on the circumstances, participants in the Program were told that the money would be

deposited in a "Strict Sole Escrow" for 15-20 business days and then released back to them at closing. Participants were further told that the Escrow "is never touched, never encumbered and there are no liens put against it." If there is no closing, participants were told one hundred percent (100%) of the Escrow would be returned.

7.    There were two options offered for funding. Funding Option 1 was an interest only loan over a period of 10, 15 or 20 years depending on the amount and the project. The Interest Rate was to be determined on the project and terms and the Real Estate will be between six percent (6%) and nine percent (9%) depending on the project, term and state in which the project is located. Participants were further told that the transaction would be closed through A Clear Title and Fifth Third. Funding Option 2 was a joint venture where the Lender will do a Joint Venture with the borrower for up to fifty percent (50%) equity in the project(s). There would be no debt service. The transaction would be closed through A Clear Title and Fifth Third and a five percent (5%) Broker fee would be due at closing.

8.    Participants were told that "There are no up front fees to be paid in this Real Estate Program."

9.    Participants were told and/or otherwise provided with all of this information regarding the Program before depositing Escrow Funds with A Clear Title and Fifth Third.

10.    Thinking their money was safe and not at risk because it was being deposited into an escrow account at Fifth Third, participants, including, but not limited to Plaintiffs, deposited money into the escrow account. Plaintiffs each deposited $250,000 into the escrow account pursuant to the Program.

11.     Rather than holding the escrow funds and using them to secure a letter of credit or bank guarantee as promised, Defendants either withdrew the money from the escrow account, without consent, or never placed the funds in an escrow account in the first place, and used the escrow funds for their own purposes.

12.     Defendants would then provide the participants false and fictitious information and documents regarding purported attempts to obtain the letter of credit or bank guarantee to fund the real estate projects.  In some instances, including, but not limited to the situation involving Plaintiffs, Defendants would be able to provide excuses regarding the delays in funding for over a year.

13.     The purported letters of credit and bank guarantees offered by Defendants were fictitious.  Defendants never actually obtained any 'funding' through either a letter of credit of bank guarantee for any real estate projects pursuant to the Program.  Instead, if a participant complained too much about the excuses and delays and demanded return of the escrow funds, Defendants would return the escrow amount to that person by using new escrow funds from new participants in the Program.

**Gondeck's Introduction to the Program**

14.     In late 2009, Gondeck was looking for financing for the purchase of property located at 3372 Old McHenry Road, Long Grove, Illinois where he planned to build a new residence (hereinafter referred to as "the Home Purchase").

15.     Gondeck was introduced to Spies by Don Silich, who was the owner of the property at 3372 Old McHenry Road, Long Grove, Illinois.  Spies had previously financed multiple clients of Silich through Bank of America and other funding sources.

16.    Gondeck met with Spies on or about January 15, 2010 to discuss possible options for obtaining the required financing for the Home Purchase.

17.    During Gondeck's meeting with Spies on January 15, 2010, Spies recommended a new investment group out of New York – Master Vision Group, USA, Inc. ("MVG") and Sovren Management, LLC ("Sovren") – that was capable of financing "new construction" at reasonable rates.

18.    Spies then emailed Gondeck the necessary paperwork to be completed, which was done, and Gondeck sent an initial wire transfer to MVG/Sovren of $8,100. Gondeck later wire transferred additional money to MVG/Sovren in association with this financing deal, which purportedly was being funded through the purchase and sale of Senior Life Settlement Policies.

19.    Spies provided Gondeck with numerous updates regarding the status of the funding regarding the Home Purchase during the early part of 2010.  These updates were provided through emails, text messages and phone conversations.  On several occasions, Spies communicated with Gondeck through his Bank of America email account and phone number.  On at least one occasion, Spies notified Gondeck that Bank of America would fund the balance of a stand by letter of credit that would be used to provide the funding for the Home Purchase.

20.    Gondeck was never able to obtain the financing for the Home Purchase through the deal with MVG and Sovren recommended by Spies. The failure to provide this funding is the subject of a separate dispute.

21.    After it became apparent that the funding for the Home Purchase would not be available through the MVG/Sovren deal, Gondeck had numerous discussions with

Spies regarding alternative sources of financing for the Home Purchase in June and July 2010. These discussions involved the Program described above.

22. In July 2010, Spies recommended the Program to Gondeck to obtain the financing for the Home Purchase. This version of the Program involved Harrison, SRV Associates, Lux Group, SRV Holdings, A Clear Title, and Cormier.

**O'Malley's Introduction to the Program**

23. O'Malley was introduced to Spies through a mutual acquaintance, Anthony Nuzzo ("Nuzzo") in or around July 2010.

24. When Spies solicited O'Malley in July 2010, he offered a secured investment opportunity thorough his "business associates" Harrison and Cormier. Spies explained the Program as an 'investment opportunity' that banks, including Bank of America, were doing to secure real estate capital investments.

25. On July 22, 2010, Spies sent an email to O'Malley, with a copy to Nuzzo, attaching a sample escrow agreement and release, a prospectus of the Program and wire instructions, including the name and telephone number of a Branch Manager by the name of Joanne at Fifth Third. The sample escrow agreement and release were copies of the ones eventually signed by Gondeck as described herein.

26. Spies also attached a "Third Party Proof of Funds Agreement" ("Third Party POF"). This Third Party POF related to Nuzzo's desire, through a company known as S&N Ventures, LLC, which was joint venture between Nuzzo and Spies, to "sell/acquire/refinance" property located at 81 Open Parkway South and 60 Tournament Drive South in Hawthorn Woods, Illinois ("Transaction Project") with proceeds to be provided by Princeton Capital Partners or another "to be determined" financer. In order

to facilitate the project, Nuzzo was required to verify liquid assets, which was to be done by O'Malley using his personal verifiable liquid assets in connection with the Transaction Project. Harrison was also involved in the coordinating and/or financing the Third Party POF

27. Pursuant to the Third Party POF, O'Malley was to provide proof of funds in the amount of $250,000. O'Malley was to wire the proof of funds into an escrow account maintained by A Clear Title. The Third Party POF stated that the escrow account "shall be in the name of [O'Malley] and [O'Malley] shall have complete dominion over said account at all times." Upon successful funding or termination of the Third Party POF, the proof of funds in the escrow account "shall be returned to [O'Malley]."

28. In exchange for providing the proof of funds, Nuzzo was to pay O'Malley a fee in the amount of $50,000. Spies was also going to receive a portion of this fee.

29. The Third Party POF deal never moved forward and instead Spies recommended a different deal involving Harrison that again involved placing proof of funds in an escrow account with A Clear Title.

30. This new deal with Harrison involved O'Malley depositing $250,000 into an escrow account maintained by A Clear Title at Fifth Third which would be used as proof funds so that Harrison could purchase a Bank Guarantee. The funds from the Bank Guarantee would then be used to refinance the Transaction Project and pay O'Malley an increased fee of $100,000.

31. Spies explained his relationship with Harrison as someone he had done business with through Bank of America contacts.

9

32. Spies described Cormier as a reputable Escrow Agent and that his company, A Clear Title, had a direct affiliation with Chicago Title Insurance Company.

33. Spies further told O'Malley that he had several other investors lined up and that he would be receiving a commission from Harrison for his efforts. Spies described this investment opportunity as a "game changer" for everyone involved.

**Plaintiffs Dealings with Spies, Harrison and Cormier Regarding the Program**

34. Plaintiffs never actually met Harrison and Cormier. All the initial information regarding the Program came from Spies. Subsequently, Plaintiffs received information and status updates from Harrison and Cormier regarding the status of the 'investment opportunity' in the Program.

35. Spies, Harrison and Cormier explained this version of the Program as follows: Plaintiffs would be required to each deposit $250,000 into an escrow account maintained by A Clear Title at Fifth Third that would be used as 'proof of funds' so that Harrison, through his companies SRV Associates and/or Lux Group and/or SRV Holdings, would be able to negotiate a Bank Guarantee ("BG") or Stand By Letter of Credit ("SBLC"). The BG or SBLC would then be 'monetized' to fund not only real estate projects owned and/or operated by Harrison, SRV Associates, Lux Group and/or SRV Holdings, but also for the funding of the Gondeck Home Purchase and refinancing of the Transaction Project, including the fee to O'Malley in consideration for putting up his personal assets as proof of funds.

36. In reliance on Spies' representations regarding the credibility of Harrison and Cormier, his past dealings with them, including dealings through Bank of America,

and Spies' position of authority at Bank of America, Plaintiffs agreed to each deposit $250,000 into an escrow account maintained by A Clear Title.

37.     Spies and Cormier repeatedly advised Plaintiffs that the escrow fund deposits were only going to be used for proof of funds and would not be at risk.

38.     Cormier also advised Plaintiffs that the escrow account was licensed, bonded and secured.

**Gondeck's Escrow Account Agreements and Escrow Funds Deposit**

39.     Gondeck entered into an Escrow Release dated July 6, 2010 with A Clear Title regarding the $250,000 to be deposited in escrow ("Gondeck Escrow Funds")(A copy of the July 6, 2010 Escrow Release is attached as Exhibit A).  Cormier signed the Escrow Release as a Managing Member of A Clear Title.

40.     The Escrow Release stated that escrow account was "for the purchase of completing POF (proof of funds) for the negotiation of a BG (bank guarantee)", that the "funds shall be held in escrow for 21 (twenty-one) days" and that A Clear Title "further agrees to release said funds back to Mr. Gondeck on the 22nd day unless instructed otherwise by Mr. Gondeck."

41.     Gondeck further entered into a Sole Order Escrow Agreement dated July 7, 2010 with A Clear Title (A copy of the July 7, 2010 Sole Order Escrow Agreement is attached as Exhibit B).   Cormier signed the Escrow Release as a Managing Member of A Clear Title.

42.     The Sole Order Escrow Agreement stated that the Gondeck Escrow Funds would be deposited into escrow and that "said funds are solely owned by Mr. James Gondeck."  The Agreement further provided that the Gondeck Escrow Funds would not

be released or surrendered "except on an order signed by the party hereto, its respective legal representatives or assigns, or order of court as aforesaid."

43.     Cormier provided Gondeck with instructions for the wire transfer of the Gondeck Escrow Funds for deposit with Fifth Third.  (A copy of the Incoming U.S. Domestic Wire Transfer Instructions is attached as Exhibit C).

44.     Prior to sending the Gondeck Escrow Funds to A Clear Title, Gondeck contacted Fidelity, through Chicago Title Insurance Company, to confirm that A Clear Title was an agent of Fidelity and/or Chicago Title Insurance Company.

45.     On July 6, 2010, Tara Doherty of Chicago Title Insurance Company sent Gondeck an email confirming that A Clear Title was an appointed agent of Fidelity.

46.     Prior to sending the Gondeck Escrow Funds, Gondeck also received confirmation from Fifth Third that A Clear Title maintained an escrow account at the bank.

47.     On July 7, 2010, Gondeck authorized the wire transfer of the Gondeck Escrow Funds from his TD Ameritrade account to Fifth Third.  The wire instructions to Fifth Third specifically stated that the Gondeck Escrow Funds were for a sole escrow account held by "A Clear Title & Escrow Exchange, LLC."

48.     Gondeck and Cormier entered in a Sole Order Escrow Agreement dated August 17, 2010 that extended the Agreement to August 31, 2010. (A copy of the August 17, 2010 Sole Order Escrow Agreement is attached as Exhibit D).   The terms of the August 17, 2010 Agreement were the same as those of the July 6, 2010 Agreement.

49.     Gondeck and Cormier entered into an Addendum to Escrow Release dated October 12, 2010.  (A copy of the October 12, 2010 Addendum to Escrow Release is

attached as Exhibit E). The Addendum stated that the A Clear Title would continue to hold the Gondeck Escrow Funds in escrow as proof of funds until October 31, 2010.

50.     On numerous occasions, Cormier stated in writing that the Escrow Funds remained in the escrow account at Fifth Third, including a signed letter dated November 15, 2010 (A copy of the November 15, 2010 letter is attached as Exhibit F).

51.     Gondeck never provided authorization, either verbally or in writing, permitting the withdrawal of the escrow funds from the escrow account.

**O'Malley's Escrow Account Agreements and Escrow Funds Deposit**

52.     In or around November 2010, O'Malley entered into the aforementioned verbal agreement with Harrison and/or SRV Associates whereby O'Malley agreed to deposit $250,000 into an escrow account maintained by A Clear Title as proof of funds for the negotiation of a BG that would then be used to finance the Transaction Project.

53.     The BG was to be purchased and monetized on or before November 15, 2010 at which time O'Malley was to receive his escrow funds back plus an additional fee of $100,000 in consideration for using his personal assets as the proof of funds.

54.     A Clear Title was to act as the escrow agent for O'Malley and Harrison/SRV Associates.

55.     O'Malley was provided with an agreement dated November 3, 2010 signed by Cormier, as Managing Member of A Clear Title, and Harrison, as Managing Member of SRV Associates. (A Copy of the November 3, 2010 Agreement is attached as Exhibit G).

56.     Pursuant to the Agreement, A Clear Title was not to provide verification of the existence and/or value of the deposit into the escrow account without written authorization from all parties involved.

57.     Cormier provided O'Malley with instructions for the wire transfer of the Escrow Funds for deposit with Fifth Third.  These instructions were identical to the instructions provided to Gondeck, attached as Exhibit C hereto.

58.     On November 4, 2010, O'Malley wire transferred $250,000 to Fifth Third into the escrow account maintained by A Clear Title ("O'Malley Escrow Funds").  The wire instructions to Fifth Third specifically stated that the O'Malley Escrow Funds were for an escrow account held by "A Clear Title & Escrow Exchange, LLC."

59.     On February 7, 2011, A Clear Title provided O'Malley with written confirmation, signed by Cormier, that the BG was being monetized and funds were to be dispersed within the next ten business days or less.  (A copy of the February 7, 2011 signed statement is attached as Exhibit H).  A Clear Title/Cormier further stated that if funding had not taken place in 10 days, the O'Malley Escrow Funds would be returned to him.

60.     O'Malley never provided authorization, either verbally or in writing, permitting the withdrawal of the escrow funds from the escrow account.

**Defendants' False and Misleading Communications**

61.     After the escrow funds were deposited into the escrow account, Spies, Harrison and Cormier repeatedly provided Plaintiffs with false and misleading information regarding the efforts supposedly being made to negotiate and monetize a BG or SBLC.

62.     Beginning in July 2010 and continuing throughout 2011, Spies, Cormier and Harrison sent numerous emails and texts to Plaintiffs and had numerous telephone conversations with Plaintiffs regarding the purported progress of the negotiation and monetization of the BG and/or SBLC.  At various times, Spies, Cormier and Harrison referenced ongoing meetings with "Bridge" providers, banks, and other investors as well as the need to finalize "paperwork" on various notes, mortgages and joint venture agreements.  These statements were false and fictitious.

63.     Spies, Cormier and Harrison repeatedly promised that the negotiation of the BG and/or SBLC was imminent, that wire transfer funds were set to be received and that the Gondeck and O'Malley Escrow Funds would be returned.  These promises and statements were false and fictitious.

64.     When Plaintiffs questioned the reasons for the delays in the negotiation of the BG and/or SBLC and the return of the Escrow Funds, Spies, Cormier and Harrison provided Plaintiffs with a variety of different excuses for the delays in negotiating the BG and/or SBLC.  These statements were false and fictitious.

65.     Spies often communicated with Plaintiffs from his Bank of America email account and his Bank of America phone.

66.     Spies, Cormier and Harrison repeatedly sent Plaintiffs documents purportedly establishing the efforts being made to negotiate a BG and/or SBLC. These documents were false and/or forged.

**Plaintiffs' Demand for Return of the Escrow Funds**

67.     Plaintiffs have made repeated demands to Spies, Cormier and Harrison for the return of the Escrow Funds.

68.     The Escrow Funds have never been returned.

69.     At all relevant times, the Escrow Funds belonged to Plaintiffs.

70.     Upon information and belief, the Gondeck and O'Malley Escrow Funds have been withdrawn from the escrow account at Fifth Third by Cormier on behalf of A Clear Title.

71.     Upon information and belief, Cormier then distributed some or all of the Gondeck and O'Malley Escrow Funds to Harrison, SRV Associates, Lux Group, SRV Holdings and/or Spies.

72.     Upon information and belief, Cormier, Harrison and/or Spies have used the Escrow Funds belonging to Plaintiffs for their own individual benefit and/or to pay off other participants in the Program.

## CAUSES OF ACTION

### COUNT I

**Acquisition and Maintenance of an Interest in and Control of an Enterprise
Engaged in a Pattern of Racketeering Activity:
18 U.S.C. § 1962(b), (c) and (d)**

73.     Plaintiffs incorporate the averments of all previous paragraphs as if fully set forth herein.

74.     At all relevant times there was in full force and effect a statute known as The Racketeer Influenced and Corrupt Organizations Act (RICO), which provides for a civil cause of action for acts performed as part of an ongoing criminal enterprise or organization.  18 U.S.C § 1961, *et. seq.*

75.     At various times and places as described herein, Defendants Spies, Cormier, A Clear Title, Harrison, SRV Associates, Lux Group and SRV Holdings did

acquire and/or maintain directly or indirectly, an interest in or control of a RICO enterprise of individuals who were associated in fact and who did engage in, and whose activities did affect, interstate and foreign commerce, all in violation of 18 U.S.C §1962(b), (c) and (d).

76.     Defendants did cooperate jointly and severally in the commission of two or more of the RICO predicate acts that are itemized in the RICO laws.

77.     Defendants were employed by or associated with an enterprise engaged in, or the activities of which affected, interstate commerce and conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

78.     Bank of America aided and abetted in carrying out these RICO violations by knowingly allowing its employee, Spies, to conduct and participate in the fraudulent scheme.  Bank of America further aided and abetted these RICO violations by allowing Spies to conduct his racketeering activities through Bank of America phones and email accounts.  Bank of America's conduct substantially assisted the ongoing fraudulent scheme achieved through racketeering activities.

79.     Fifth Third aided and abetted in carrying out these RICO violations by knowingly allowing A Clear Title and/or Cormier to continue making substantial withdraws from an escrow account without consent of the Plaintiffs who deposited the money into the escrow account, despite having direct knowledge that the funds deposited into that account were for escrow purposes only.  Fifth Third further aided and abetted in carrying out this fraud by affirmatively representing to Plaintiffs that A Clear Title

maintained an escrow account at the bank. Fifth Third's conduct substantially assisted the ongoing fraudulent scheme achieved through racketeering activities.

80.     Fidelity aided and abetted in carrying out this fraud by knowingly allowing A Clear Title, its agent, to breach its fiduciary obligations as an escrow agent to Plaintiffs by illegally withdrawing the Escrow Funds from the escrow account for personal use. Fidelity's conduct substantially assisted the ongoing fraudulent scheme achieved through racketeering activities.

81.     Plaintiffs each suffered damages of at least $250,000 as a result of Defendants' RICO violations.

## COUNT II

## Conspiracy

82.      Plaintiffs incorporate the averments of all previous paragraphs as if fully set forth herein.

83.     During all relevant times, Defendants conspired with each other to scam and defraud Plaintiffs and others unknown to Plaintiffs.

84.     During all relevant times, Spies was an employee of Bank of America and was at all times acting within the purpose and scope of his employment.

85.     During all relevant times, Harrison was an owner and/or manager and/or employee of SRV Associates, Lux Group and SRV Holdings and was at all times acting on behalf of those entities and individually.

86.     During all relevant times, Cormier was an owner and/or manager and/or employee of A Clear Title and was at all times acting on behalf of that entity and individually.

87.     During all relevant times, A Clear Title was an agent of Fidelity and at all times was acting within the scope of such agency.

88.     Defendants did the acts and things alleged herein pursuant to, and in furtherance of, the conspiracy and above-alleged fraudulent scheme.

89.     As a direct and proximate result of the conspiracy of these defendants, Plaintiffs were severely wronged and damaged, both financially, emotionally and reputation wise.  Plaintiffs are entitled to compensatory damages at trial in an amount to be determined at trial.

90.     Defendants did the things alleged herein maliciously and to oppress Plaintiffs.  Plaintiffs are therefore entitled to exemplary or punitive damages in an amount to be determined at trial.

### COUNT IIII

### Common Law Fraud

91.     Plaintiffs incorporate the averments of all previous paragraphs as if fully set forth herein.

92.     Defendants Spies, Harrison, SRV Associates, Lux Group, SRV Holdings, Cormier and A Clear Title made numerous false statements, representations and claims to each Plaintiff as alleged herein.

93.     When the Defendants made these statements, representations and claims to Plaintiffs, they knew them to be false and these statements, representations and claims were made by Defendants with the intent to defraud and deceive plaintiffs and with the intent to induce Plaintiffs to act in the manner alleged herein.  At the time Defendants made the promises to Plaintiffs, they had no intention of performing them.

94.    Plaintiffs relied on the Defendants' false statements, representations and claims to their own detriment.

95.    Plaintiffs, at the time these statements, representations and claims were made by Defendants and at the time Plaintiffs deposited the Escrow Funds into the escrow account, were ignorant of the falsity of these statements, representations and claims and believed them to be true and could not, in the exercise of reasonable diligence, have discovered Defendants' fraudulent intention.

96.    Defendants Bank of America, Fifth Third and Fidelity aided and abetted this fraudulent scheme through the actions or omissions alleged herein.

97.    As a direct and proximate result of each Defendants' fraud and deceit, Plaintiffs have been damaged in an amount to be determined at trial.

## COUNT IV

## Wire Fraud

98.    Plaintiffs incorporate the averments of all previous paragraphs as if fully set forth herein.

99.    Defendants Spies, Harrison, SRV Associates, Lux Group, SRV Holdings, Cormier and A Clear Title have committed wire fraud in violation of 18 U.S.C. § 1343 by having devised a scheme or artifice to defraud Plaintiffs, for the purpose of obtaining money or property by means of false or fraudulent pretenses, representations or promises and transmitted or caused to be transmitted by means of wire communications in interstate commerce, writings, emails and other documents for the purpose of executing their fraudulent scheme.

100.    When the Defendants made these representations by wire each of them knew them to be false, and these representations were made by defendants with the intent to defraud and deceive Plaintiffs with the intent to induce Plaintiffs to act in the manner alleged herein.  At the time Defendants made the promises to Plaintiffs, Defendants had no intention of performing them.

101.    Defendants Bank of America, Fifth Third and Fidelity aided and abetted this wire fraud through the actions or omissions alleged herein.

102.    As a direct and proximate result of the conspiracy of these defendants, Plaintiffs were severely wronged and damaged, both financially, emotionally and reputation wise.  Plaintiffs are entitled to compensatory damages in an amount to be determined at trial.

103.    Defendants did the things alleged herein maliciously and to oppress Plaintiffs.  Plaintiffs are therefore entitled to exemplary or punitive damages in an amount to be determined at trial.

### COUNT V

**Securities Fraud:**
**Violations of Section 17(a)(1) of the Securities Act**
**[15 U.S.C. § 77q(a)(1)]**

104.    Plaintiffs incorporate the averments of all previous paragraphs as if fully set forth herein.

105.    At all relevant times, Defendants Spies, Harrison, SRV Associates, Lux Group, SRV Holdings, Cormier and A Clear Title, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by used of the mails, directly and indirectly,

employed devices, schemes and artifices to defraud purchasers of such securities as described herein.

106.    Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

107.    While engaging in the course of conduct described above, Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severely reckless disregard for the truth.

108.    Plaintiffs have been damaged by Defendants' conduct in an amount to be determined at trial.

## COUNT VI

### Securities Fraud:
### Violations of Section 17(a)(2) and 17(a)(3) of the Securities Act
### [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]

109.    Plaintiffs incorporate the averments of all previous paragraphs as if fully set forth herein.

110.    At all relevant times, Defendants Spies, Harrison, SRV Associates, Lux Group, SRV Holdings, Cormier and A Clear Title, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, as alleged herein:

   a. Obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

b. Engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities

111. Plaintiffs have been damaged by Defendants' conduct in an amount to be determined at trial.

## COUNT VII

**Securities Fraud:**
**Violations of Section 10(b) of the Exchange Act**
**[15 U.S.C. § 78j(b) and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5]**

112. Plaintiffs incorporate the averments of all previous paragraphs as if fully set forth herein.

113. At all relevant times, Defendants Spies, Harrison, SRV Associates, Lux Group, SRV Holdings, Cormier and A Clear Title, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, as alleged herein:

a. Employed devices, schemes, and artifices to defraud;

b. Made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c. Engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities.

114. Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, make untrue statements of

material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business. In engaging in such conduct, Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severely reckless disregard for the truth.

115. Defendants Bank of America, Fifth Third and Fidelity aided and abetted in the actions of Defendants Spies, Harrison, SRV Associates, Lux Group, SRV Holdings, Cormier and A Clear Title because their conduct as alleged herein was reckless.

116. Defendants Bank of America, Fifth Third and Fidelity owed Plaintiffs a fiduciary duty to disclose the fraudulent actions of Defendants Spies, Harrison, SRV Associates, Lux Group, SRV Holdings, Cormier and A Clear Title and failed to do so. This failure aided and abetted the fraudulent scheme carried out by Defendants Spies, Harrison, SRV Associates, Lux Group, SRV Holdings, Cormier and A Clear Title.

117. Plaintiffs have been damaged by Defendants' conduct in an amount to be determined at trial.

## COUNT VIII

### UNREGISTERED OFFERING OF SECURITIES
### Violations of Sections 5(a) and 5(c) of the Securities Act
### [15 U.S.C. §§ 77e(a) and 77e(c)]

118. Plaintiffs incorporate the averments of all previous paragraphs as if fully set forth herein.

119. Upon information and belief, no registration statement has been filed or is in effect with the Securities and Exchange Commission ("Commission") pursuant to the Securities Act and no exemption from registration exists with respect to the transactions described herein.

120. At all relevant times, Defendants Spies, Harrison, SRV Associates, Lux Group, SRV Holdings, Cormier and A Clear Title, singly and in concert, have, without a registration statement having been filed with the Commission as to such securities:

    a. Made use of the means and instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use of medium of a prospectus or otherwise;

    b. Carried securities or caused such securities to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; and

    c. Made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy securities, through the use or medium of any prospectus or otherwise.

121. Plaintiffs have been damaged by Defendants' conduct in an amount to be determined at trial.

## COUNT IX

**EFFECTING SECURITIES TRANSACTIONS FOR THE ACCOUNTS OF OTHERS WITHOUT BEING REGISTERED WITH COMMISSION AS A BROKER**
**Violations of Section 15(a) of the Exchange Act**
**[15 U.S.C. §78o(a)]**

122. Plaintiffs incorporate the averments of all previous paragraphs as if fully set forth herein.

123. Upon information and belief, Spies, Harrison and Cormier are not registered brokers with the Commission.

124.   At all relevant times, Spies, Harrison and Cormier have been using the mails and the means and instrumentalities of interstate commerce, to effect transactions in, or induce or attempt to induce the purchase or sale of securities, with registering with the Commission as a broker.

125.   Plaintiffs have been damaged by Defendants' conduct in an amount to be determined at trial.

## COUNT X

### RESPONDEAT SUPERIOR
### [Against Bank of America]

126.   Plaintiffs incorporate the averments of all previous paragraphs as if fully set forth herein.

127.   At all relevant times, Spies was a Home Loans Manager employed by Bank of America.

128.   In his position as a Home Loans Manager, Spies had a significant amount of control and responsibility working with customers regarding financial transactions involving financing for the purchase of homes or the refinancing of existing mortgages.

129.   At all relevant times, Spies was acting the in the course of his employment and in furtherance of the business of Bank of America.  On numerous occasions, Spies communicated with Plaintiffs from his Bank of America phone number and email account.

130.   Plaintiffs reasonably believed that Spies' actions as alleged herein were being done on behalf of and in furtherance of the business of his employer, Bank of America.

131.     Bank of America is liable for the negligent, willful, malicious and/or criminal acts of Spies.

132.     Plaintiffs have been damaged by Spies' acts, for which Bank of America is responsible under the doctrine of respondeat superior, in an amount to be determined at trial.

## COUNT XI

## AGENCY
### (Against Fidelity)

133.     Plaintiffs incorporate the averments of all previous paragraphs as if fully set forth herein.

134.     At all relevant times, A Clear Title was a licensed agent of Fidelity in the State of Florida.

135.     Fidelity, through its employees, confirmed to Plaintiffs that A Clear Title was its licensed agent.

136.     Plaintiffs reasonably believed that A Clear Title was acting on behalf of Fidelity.

137.     At all relevant times, A Clear Title was an agent for Fidelity.

138.     At all relevant times, A Clear Title was acting within its authority as Fidelity's agent.

139.     Fidelity knew or should have known that A Clear Title was committing a fraud against Plaintiffs.

140.     Fidelity, as the principal, is responsible for the actions of its agent, A Clear Title.

141.     Plaintiffs have been damaged by A Clear Title's acts in an amount to be determined at trial.

## COUNT XI

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against Spies, Harrison, SRV Associates, Lux Group,
### SRV Holdings, Cormier and A Clear Title)

142.     Plaintiffs incorporate the averments of all previous paragraphs as if fully set forth herein.

143.     Defendants acted in an intentional and malicious manner and for the purpose of causing Plaintiffs to suffer humiliation, mental anguish and emotional and physical distress.

144.     Defendants' conduct was extreme and outrageous.

145.     Defendants knew or should have known that their conduct would inflict severe emotional distress.

146.     Plaintiffs have suffered damages and injuries due to the intentional infliction of emotional distress in an amount to be determined at trial.

## COUNT XII

### UNJUST ENRICHMENT
### (Against Spies, Harrison, SRV Associates, Lux Group,
### SRV Holdings, Cormier and A Clear Title)

147.     Plaintiffs incorporate the averments of all previous paragraphs as if fully set forth herein.

148.     Defendants have unjustly enriched themselves, and attempted to further enrich themselves, to the detriment of Plaintiffs by taking their money, by inducing them

to rely on their promises through fraudulent documents and other deceitful means as described above.

149.     As a direct and proximate result of the Defendants conduct, Plaintiffs have been damaged in an amount to be determined at trial.

## COUNT XIII

### BREACH OF CONTRACT
### (Against Spies, Harrison, SRV Associates, Lux Group, SRV Holdings, Cormier and A Clear Title)

150.     Plaintiffs incorporate the averments of all previous paragraphs as if fully set forth herein.

151.     Defendants entered into contracts with Plaintiffs as described herein.

152.     Defendants did not perform on a single contractual promise made to Plaintiffs.

153.     Defendants have breached their contracts with Plaintiffs with damages to be determined at trial.

## COUNT XIV

### BREACH OF FIDUCIARY DUTY
### (Against Spies, Bank of America, A Clear Title, Fifth Third and Fidelity)

154.     Plaintiffs incorporate the averments of all previous paragraphs as if fully set forth herein.

155.     Defendants owed Plaintiffs a fiduciary duty.

156.     Defendants knew or should have known that a diversion or misappropriation of Plaintiffs' Escrow Funds was intended or was being executed.

157.    Defendants had a fiduciary duty to disclose to Plaintiffs that diversion or misappropriation of the Escrow Funds was intended or was being executed.

158.    Had Defendants conducted a reasonable investigation or inquiry, they would have known that a diversion or misappropriation of the Escrow Funds was intended or was being executed.  As such, Defendants are charged with such knowledge as a reasonable investigation or inquiry would have disclosed.

159.    Defendants have breached their fiduciary duty to Plaintiffs.

160.    Plaintiffs have been damaged by Defendants' breach of fiduciary duty in an amount to be determined at trial.

## COUNT XV

### NEGLIGENCE
### [Against Spies, Bank of America, A Clear Title, Fifth Third and Fidelity]

161.    Plaintiffs incorporate the averments of all previous paragraphs as if fully set forth herein.

162.    Defendants owed Plaintiffs a duty of care to act in a reasonable, prudent manner.

163.    Defendants breached their duty of care to Plaintiffs by failing to use due care in investigating or inquiring about the diversion or misappropriation of the Plaintiffs' Escrow Funds from the escrow account maintained at Fifth Third.

164.    As a direct and proximate result of the negligence of the Defendants, Plaintiffs have suffered damages in an amount to be determined at trial.

## COUNT XVI

### CIVIL THEFT
### [Against Cormier, A Clear Title, Harrison,
### SRV Associates, Lux Group and SRV Holdings]

165.    Plaintiffs incorporate the averments of all previous paragraphs as if fully set forth herein.

166.    At all relevant times, there was in full force and effect a statute in Florida entitled "Civil remedy for theft of exploitation," Fla. Stat. § 772.11.

167.    Under Florida law, a person commits theft if he knowingly obtains or uses, or endeavors to obtain or to use, the property or another with intent to, either temporarily or permanently deprive the other person of a right to the property or a benefit from the property or appropriate the property to his own use or to the use of any person not entitled to the use of the property.

168.    Defendants committed theft under Florida law.

169.    Pursuant to the Civil remedy for theft or exploitation statute, Plaintiffs have a cause of action for threefold the actual damages sustained, reasonable attorneys' fees and court costs.

## COUNT XVII

### FRAUDULENT MISREPRESENTATION
### (Against Spies, Cormier, A Clear Title, Harrison,
### SRV Associates, Lux Group, and SRV Holdings)

170.    Plaintiffs incorporate the averments of all previous paragraphs as if fully set forth herein.

171.    As described herein, Defendants made false statements of material fact to Plaintiffs.

172.     At the time Defendants made the statements of material fact, they knew or believed them to be false.

173.     Defendants made the false statements of material fact in order to induce Plaintiffs to deposit Escrow Funds into the escrow account so that Defendants could misappropriate the Escrow Funds for their own personal use.

174.     Plaintiffs justifiably relied on Defendants false statements in depositing the Escrow Funds into the escrow account believing that the Escrow Funds were not at risk and would not be touched by Defendants.

175.     As a result of their reliance on Defendants' fraudulent misrepresentations, Plaintiffs have suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand the following:

On behalf of Plaintiff JAMES GONDECK:

A.     Compensatory against the Defendants in an amount of no less than two hundred and fifty thousand dollars ($250,000.00), plus interest;

B.     Treble damages against the Defendants for RICO violations and violations of the Civil remedy for theft or exploitation;

C.     Punitive damages in excess of three million dollars ($3,000,000.00);

D.     Attorneys' fees;

E.     The costs of this action;

F.     For such other and further relief to which Plaintiff, JAMES GONDECK, may be deemed entitled to at law and/or equity.

On behalf of Plaintiff PETER G. O'MALLEY:

A.    Compensatory against the Defendants in an amount of no less than two hundred and fifty thousand dollars ($250,000.00), plus interest;

B.    Treble damages against the Defendants for RICO violations and violations of the Civil remedy for theft or exploitation;

C.    Punitive damages in excess of three million dollars ($3,000,000.00);

D.    Attorneys' fees;

E.    The costs of this action;

F.    For such other and further relief to which Plaintiff, JAMES GONDECK, may be deemed entitled to at law and/or equity.

Dated: September  12, 2011

/s/ David G. Wix_____
THE WIX LAW GROUP, LLC

David G. Wix
THE WIX LAW GROUP, LLC.
500 Lake Cook Road
Suite 350
Deerfield, IL 60015
(847) 267-9949
(866) 267-2949 (fax)
Email: dwix@wixlaw.com

*Attorneys for Plaintiffs*