UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES GONDECK and PETER G. O'MALLEY, | ) | |
| | ) | |
| Plaintiffs, | ) | 11 C 6341 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| A CLEAR TITLE AND ESCROW EXCHANGE, LLC, | ) | |
| STEPHEN J. CORMIER, JUSTYNA MICHALOWSKA, | ) | |
| FIDELITY NATIONAL TITLE GROUP, INC. (d/b/a | ) | |
| CHICAGO TITLE INSURANCE COMPANY and | ) | |
| TICOR TITLE), CHICAGO TITLE INSURANCE | ) | |
| COMPANY, TICOR TITLE INSURANCE COMPANY, | ) | |
| SRV ASSOCIATES, LLC, THE LUX GROUP, LLC, | ) | |
| SRV HOLDINGS & ASSOCIATES, LLC, MAREK R.V. | ) | |
| HARRISON, and MICHAEL SPIES, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

James Gondeck and Peter G. O'Malley allege in this suit that they were the victims of a

fraudulent scheme involving the improper withdrawal and misappropriation of funds they

deposited into an escrow account that A Clear Title and Escrow Exchange maintained at Fifth

Third Bank. Doc. 68. The suit alleges, among other things, that Chicago Title Insurance

Company and Ticor Title Insurance Company—which, having merged effective June 2010, Doc.

245 at p. 2, ¶ 3, together will be called "Chicago Title"—are vicariously liable for A Clear Title's

misconduct and directly liable for their own negligence. In ruling on Chicago Title's motion to

dismiss, the court allowed both claims to proceed, but held that the vicarious liability claim could

go forward only on an apparent authority theory and also that Chicago Title could not be held

vicariously liable for A Clear Title's alleged civil RICO violations or for treble or punitive

damages. Docs. 131-132 (reported at 2012 WL 3638321 (N.D. Ill. Aug. 22, 2012)).

1

A jury trial has been set for August 4, 2014. Doc. 240. Now before the court is Chicago Title's motion for summary judgment. Doc. 205. The motion is granted as to the negligence claim and denied as to the vicarious liability/apparent authority claim.

## Background

The following facts are stated as favorably to Plaintiffs, the non-movants, as permitted by the record and Local Rule 56.1. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012).

### A. A Clear Title and Chicago Title

Chicago Title is a provider of title insurance and escrow services. Doc. 245 at p. 2, ¶ 3. Prior to the events at issue in this case, Plaintiffs used Chicago Title as the title and escrow agent for the purchases of their homes and the closings of those transactions. *Id*. at p. 28, ¶ 26.

On September 10, 2007, A Clear Title and Chicago Title entered into an Issuing Agency Contract appointing A Clear Title "as a policy issuing agent of [Chicago Title] for the sole purpose of issuing title insurance commitments, policies, endorsements and other title assurances approved by [Chicago Title]." *Id*. at pp. 2-3, ¶ 5; *see* Doc. 207-1 at 2-11. The Issuing Agency Contract itself was not accessible to the general public, Doc. 248 at ¶ 25, but the Florida Department of Financial Services website showed A Clear Title as being a "TITLE INS AGENCY" on behalf of Chicago Title, Doc. 200-6 at 32.

A policy issuing agent like A Clear Title may issue a title insurance policy on Chicago Title's behalf only if it employs individuals who are appointed as title insurance agents. Doc. 248 at ¶ 4. At the time Chicago Title entered into the Issuing Agency Contract with A Clear Title, Chicago Title knew that Stephen J. Cormier, a Managing Member of A Clear Title and a signatory to the Issuing Agency Contract, was only an escrow signatory and not a title agent; moreover, neither Cormier nor Justyna Michalowska, another Managing Member of A Clear

2

Title and signatory to the Issuing Agency Contract, had Chicago Title appointments as title agents. *Ibid*.; Doc. 207-1 at 6; Doc. 245 at p. 3, ¶¶ 8-9.

Prior to July 2010, Chicago Title knew that the services provided by title insurance agents varied across the country and could include acting as an escrow agent, obtaining releases, and conducting closings and/or settlements. Doc. 248 at ¶ 3. Chicago Title had non-escrow agents in States other than Florida that were authorized solely to issue policies and not to handle money at all. *Ibid*. Chicago Title also knew prior to July 2010 that A Clear Title acted as an escrow agent in real estate transactions, including the refinancing of existing mortgages; provided escrow-related services to its customers; handled escrow funds in connection with real estate transactions; handled and conducted closings in connection with real estate transactions; and conducted closings involving the disbursement of settlement funds or the provision of settlement services. *Id*. at ¶ 1.

When A Clear Title conducted closings and handled and disbursed settlement funds related to a real estate transaction, it did so as Chicago Title's agent so long as the transaction resulted in the issuance of a title insurance policy, *id*. at ¶ 2, and Chicago Title was entitled to a portion of the title insurance premiums each time A Clear Title issued such a policy, *id*. at ¶ 8. A Clear Title also acted as Chicago Title's agent when it handled commercial escrow settlements. *Id*. at ¶ 2. Chicago Title required that A Clear Title obtain and maintain in full force, at A Clear Title's expense, a Title Insurance Agent's Professional Liability Policy that covered A Clear Title's errors and omissions when it acted as an escrow agent. *Id*. at ¶ 7. Chicago Title provided A Clear Title with an Escrow Accounting Standards for Agents Manual that detailed proper escrow processes and procedures; referenced Chicago Title agents who provide construction loans and settlement services, wherein the agent agreed to act as a depository for instruments and

money relating to specific real estate transactions; and stated that "[a]ssisting agents in managing and minimizing areas of risk is a duty of utmost importance to the underwriter." *Id*. at ¶¶ 19-20. In 2009 or 2010, prior to A Clear Title's involvement in escrow-related services separate from real estate closings, Michalowska asked Barry Mazer—Chicago Title's agency representative— about the possibility of A Clear Title handling, as an agent for Chicago Title, escrows unrelated to real estate transactions. *Id*. at ¶ 6.

Chicago Title never issued any public pronouncements, press releases, or advertising materials alerting the public that A Clear Title was Chicago Title's agent only for the purpose of issuing title commitments, policies, endorsements, and assurances. *Id*. at ¶ 22. Chicago Title also never required A Clear Title to disclose on its website the limitations on its agency relationship with Chicago Title. *Ibid*. Chicago Title did not mention A Clear Title by name or otherwise on its website in any context or for any reason, including for purposes of clarifying the limitations on the scope of A Clear Title's agency. *Id*. at ¶ 21. In 2013, Chicago Title's website stated that it provides "Special Escrows," "Lender Escrows," and "Commercial Escrows," and that "Chicago Title offers you experienced escrow settlement agents who are well trained in real estate closing procedures and the issuance of title insurance. Our agents act as a disinterest [*sic*] third-party who follows the instructions of the principals." *Id*. at ¶ 23; Doc. 245-12 at 16. Also in October 2013, a page of Chicago Title's website titled "Who May Handle Escrow Settlements" stated that "[t]he settlement agent is responsible for safe-guarding and properly distributing funds and documents required to successfully complete the transaction," and another page titled "What Happens in Escrow Settlement" described the settlement agent as "[a]cting as the impartial 'stake-holder,' or depository of documents and funds" and "[k]eeping all parties

informed of the progress on the escrow." Doc. 248 at ¶ 24; Doc. 245-12 at 17-18. The content of Chicago Title's website was the same or similar in 2010. Doc. 245-4 at 33, 66.

The Issuing Agency Contract provided that A Clear Title would "not use the trade name, trade mark or any variation thereof of [Chicago Title] ... on any of its advertising without the prior written approval of [Chicago Title]." Doc. 200-4 at 6. However, Chicago Title did not have any policies or procedures in place for monitoring or reviewing A Clear Title's advertising or promotional materials and did not monitor or review those materials. Doc. 248 at ¶¶ 11-12. Chicago Title provided A Clear Title with pens and other promotional materials containing Chicago Title's name that A Clear Title could provide to customers at closings. *Id*. at ¶ 12. A Clear Title used a due diligence package, which was provided to Plaintiffs, stating that A Clear Title had an office in California, that "[w]e are a full service title & escrow company, licensed, bonded and insured," that "Chicago Title is our underwriter which part of the Fidelity National Title Group, one of the largest in the world," and that: "We are a full service title & escrow company, licensed, bonded and insured. Chicago Title Insurance, which belongs to the Fidelity National Title Group, one of the largest Insurer's in the World. We handle all aspects of commercial and residential real estate transactions, custodian of escrowed funds and closings on multi-million dollar commercial transactions." *Id*. at ¶ 10 (alterations deleted). A Clear Title's use of Chicago Title's name in its advertising and promotional material without Chicago Title's approval was grounds for terminating the Issuing Agency Contract. *Id*. at ¶ 13. Mazer testified that had he known about A Clear Title's due diligence package and that A Clear Title was holding financing-related escrows, he would have reported it to either his supervisor or the Legal Department as a "red flag" because it fell outside the scope of what a title insurance agent should be doing. *Ibid*.

### B.    Gondeck

In 2010, Gondeck was seeking financing to purchase land and construct a new home and found himself unable to obtain satisfactory terms through traditional lending sources.  Doc. 245 at p. 5, ¶¶ 15-16.  In January 2010, Michael Spies, a Home Loan Manager in the Retail Mortgage Sales Department for Bank of America, presented a possible transaction to Gondeck.  *Id*. at pp. 3, 5-7, ¶¶ 11, 17-21.  Under the terms of the proposed transaction, Gondeck would pay money to MV Group, Sovren, and Spies, and allow MV Group to use approximately Gondeck's money as "proof of funds.  *Id*. at pp. 6-7, ¶¶ 18-20.  In exchange, MV Group would broker a deal in which Sovren would provide $2.2 million in funding for Gondeck's purchase of land and construction of a house and take a 50% ownership stake in the house.  *Ibid*.  Sovren could then recoup its investment upon the future sale of the house, by having its interest purchased by Gondeck, or through earning 50% of any profits generated by the property.  *Id*. at p. 7, ¶ 21; Doc. 248 at ¶ 50. The MV Group/Sovren deal ultimately did not go forward.  Doc. 245 at p. 7, ¶ 22.

On April 30, 2010, Gondeck wired $81,300 to MV Group for a separate investment project involving Spies that involved funding for the purchase of the Alakai Hotel.  Doc. 248 at ¶ 51.  In exchange for those funds, Gondeck was to become a one-fifth partner in the hotel and receive income generated by the hotel.  *Ibid*.  That deal also did not go forward.  *Ibid*.

In or around July 2010, Spies presented to Gondeck another transaction—which will be called the Proof of Funds ("POF") Program—involving Marek Harrison and his affiliated companies, SRV Associates, LLC, Lux Group, LLC, and SRV Holdings & Associates, LLC (collectively, "SRV").  Doc. 245 at p. 8, ¶ 23.  Under the terms of the POF Program, Gondeck was to wire $250,000 into A Clear Title's escrow account at Fifth Third ("3462 Account") to be kept as "proof of funds" for an initial span of 22 days, in exchange for which an investor would

provide $2.2 million in funding for Gondeck's purchase of land and construction of a house and take a 50% ownership stake in the house. *Id*. at pp. 8-9, ¶¶ 24-25, 28. The result was to be a partnership between Gondeck and the investor with no debt service (no interest, no recourse, no down payment, and no set period for repayment), a closing of the transaction through A Clear Title and Fifth Third Bank, and a five percent broker's fee due at closing. *Id*. at pp. 9-10, ¶¶ 28-29. Gondeck was not told how the proof of funds was to be used other than that it was to be held in escrow and would remain Gondeck's asset and not SRV's asset. *Id*. at p. 8, ¶¶ 26-27; Doc. 248 at ¶ 53. Once funding was obtained through the POF Program, A Clear Title was to act as the closing agent for the real estate transaction. Doc. 245 at p. 23, ¶ 9. To repay Gondeck for the money he had wired as part of the aborted Alakai Hotel deal, and to convince Gondeck to move forward with the POF Program, Spies promised Gondeck a one-fifth partnership in the Alakai Hotel and $152,400 cash upon the Alakai Hotel closing. *Id*. at pp. 10-11, ¶ 30; Doc. 248 at ¶ 52.

Gondeck decided to participate in the POF Program because the terms offered to him were better than the market terms offered by traditional lenders. Doc. 245 at p. 11, ¶ 31. Prior to wiring his funds, he reviewed the Florida Department of Financial Services website for A Clear Title, which described A Clear Title as a title insurance agent of Chicago Title, and Chicago Title's website. Doc. 248 at ¶¶ 27-28. Gondeck also visited a branch office of Chicago Title and met with its then-employee, Tara Doherty. Doc. 245 at p. 17, ¶ 55. When visiting that office, Gondeck brought with him the wire transfer instructions and another document with A Clear Title's letterhead, told Doherty that the POF Program involved a transaction to build a house and that he was being asked to send $250,000 to A Clear Title's escrow account at Fifth Third, and asked Doherty whether A Clear Title was a Chicago Title agent, whether A Clear Title was insured by Chicago Title, whether A Clear Title was in good standing with Chicago Title,

whether A Clear Title was a Chicago Title representative, and whether the 3462 Account was a valid bank account. *Id.* at pp. 17-19, ¶¶ 56, 60; Doc. 248 at ¶ 34. Gondeck did not disclose that the $250,000 was a 22-day "proof of funds" deposit to be portrayed as an SRV asset, and he testified that during his conversation with Doherty, he "was more asking than … telling her. So I wasn't telling her what I was doing as far as here is all the parameters and guidelines." Doc. 245 at pp. 17-18, ¶¶ 57, 59. Doherty never advised Gondeck of any limitation in the scope of A Clear Title's agency. *Id.* at pp. 18-19, ¶ 60.

In response to Gondeck's inquiry, Doherty sent him several emails, none of which included the word "escrow," but one of which contained a screenshot from the Florida Department of Insurance website, which stated that A Clear Title was a "TITLE INS. AGENCY" of Chicago Title. *Id.* at p. 19, ¶¶ 61-62. Gondeck interpreted the screenshot as conveying that A Clear Title was insured by Chicago Title, and Gondeck testified that he believed that the POF Program was legitimate due in part to the fact that reputable companies like Chicago Title, Fifth Third, and Bank of America were involved. *Id.* at p. 19, ¶ 63; Doc. 248 at ¶ 30. Doherty's emails referred to Gondeck as a "customer" of Chicago Title and included in the signature line Chicago Title's logo, which read "simply the best choice in the market for real estate transaction" and was approved for use by Chicago Title. Doc. 248 at ¶¶ 37-38.

On July 7, 2010, Gondeck authorized a wire transfer of $250,000 into the 3462 Account. Doc. 245 at p. 11, ¶ 32. Gondeck's $250,000 was withdrawn from the 3462 Account without his consent and was never returned, and he never received any funding or assets (the $2.2 million interest-free loan, the $152,400 cash, or the hotel partnership) in connection with the POF Program. *Id.* at p. 11, ¶¶ 33-34.

On March 4, 2011, Gondeck called Chicago Title and explained to a Chicago Title Corporate Escrow Administrator his transaction with A Clear Title. Doc. 248 at ¶ 41. Gondeck informed that person that he had placed $250,000 in escrow with A Clear Title, had asked for his money back, and had not received it. *Ibid.* Chicago Title did not conduct any follow up regarding Gondeck's phone calls or investigate A Clear Title, and Chicago Title does not have any records relating to Gondeck's calls or any action taken by Chicago Title in response to his calls. *Id.* at ¶ 42.

### C. O'Malley

Sometime prior to July 2010, O'Malley's friend Anthony Nuzzo asked O'Malley for help with a real estate refinancing program and then introduced O'Malley to Spies. *Id.* at p. 12, ¶ 38. In July 2010, Spies presented to O'Malley a proposed transaction involving S&N Ventures, a corporate entity set up by Spies and Nuzzo; under the terms of that transaction, O'Malley would wire $250,000 into A Clear Title's 3462 Account and, in exchange, O'Malley would earn a $50,000 fee from S&N within 30 days. *Id.* at pp. 11-12, ¶¶ 35-36, 38; Doc. 248 at ¶ 55. O'Malley had no specific knowledge of how his $250,000 was to be portrayed by S&N, but knew that the funds were to remain "in [O'Malley's] sole and exclusive control." Doc. 245 at p. 12, ¶ 37.

The Third Party Funds Agreement documenting the deal was drafted by Spies and Nuzzo and then provided to O'Malley, who agreed to participate as a favor for Nuzzo so that Nuzzo could refinance his property. *Id.* at pp. 12-13, ¶ 38; Doc. 248 at ¶ 55. O'Malley understood that the funding for the refinancing was to be provided by Princeton Capital Partners, but he did not know what the arrangement was between S&N and Princeton Capital. Doc. 248 at ¶ 55. On July 22, 2010, O'Malley received a draft power point explaining the deal in an attachment to an email

from Spies. *Id.* at ¶ 59. O'Malley wired his funds on July 23, 2010, but the deal never proceeded and his deposit was returned to him in October 2010. Doc. 245 at p. 13, ¶ 39.

In early November 2010, Spies presented the POF Program to O'Malley. *Id.* at p. 13, ¶ 40. The POF Program was to be governed by terms similar to the terms of the proposed July 2010 deal, although SRV rather than S&N would be involved. *Id.* at p. 13, ¶ 41. O'Malley would deposit $250,000 as proof of funds for twelve days, and SRV would use the money as proof of funds to assist Harrison and SRV in securing financing for their property. *Id.* at pp. 13-14, ¶ 42; Doc. 248 at ¶ 57; Doc. 207-2 at 61-62. In exchange, at the end of the twelve-day period, O'Malley would receive $100,000, comprised of the $50,000 fee from the initial S&N transaction that was not realized and the $50,000 fee for the POF Program. Doc. 245 at p. 14, ¶ 44. O'Malley was to retain custody and control over his funds at all times, and O'Malley never gave A Clear Title or Cormier authorization to release his funds. *Id.* at p. 14, ¶ 43; Doc. 248 at ¶ 58. Once funding was obtained through the POF Program, A Clear Title was to act as the closing agent for the real estate transaction. Doc. 248 at ¶ 9.

Prior to wiring his funds, O'Malley reviewed Chicago Title's website, A Clear Title's website, the Florida business registration website, the Florida Department of Financial Services website as it pertained to A Clear Title, and the due diligence package provided by A Clear Title. Doc. 245 at pp. 15-16, ¶ 49; Doc. 248 at ¶¶ 27-28, 31. Nothing from these sources disclosed any limitation on the scope of A Clear Title's agency. Doc. 245 at p. 16, ¶ 49. The Florida Department of Financial Services website stated that A Clear Title was a title insurance agent of Chicago Title, which O'Malley interpreted as synonymous with escrow services agent, and A Clear Title's due diligence package stated that "Chicago Title is [A Clear Title's] underwriter."

*Id*. at p. 16, ¶¶ 50-51.  O'Malley believed that Chicago Title would be accountable for A Clear Title's handling of his escrow deposit.  Doc. 248 at ¶ 33.

On November 4, 2010, O'Malley wired $250,000 into the 3462 Account.  Doc. 245 at p. 15, ¶ 45.  In January 2011, Harrison told O'Malley that his deposit had been withdrawn and used for the purchase of a bank guarantee.  *Id*. at p. 15, ¶ 46.  Shortly thereafter, O'Malley "look[ed] at [his] legal options" and "contacted attorneys to figure out what I could do … to get my $250,000 back."  *Id*. at p. 15, ¶ 47.

O'Malley first communicated with Chicago Title in February 2011, when he called to ask whether "A Clear Title and Escrow Exchange was still a valid agent of Chicago Title."  *Id*. at pp. 15-17, ¶¶ 48, 52.  The Chicago Title representative with whom O'Malley spoke searched A Clear Title on a database and "just said they are a valid agent to Chicago Title."  *Id*. at p. 17, ¶ 53.  O'Malley did not describe the POF Program or A Clear Title's role in the Program during the call.  *Id*. at p. 17, ¶ 54.

### D.    Chicago Title's Supervision of A Clear Title

On March 30, 2011, Chicago Title received a phone call from a customer complaining that A Clear Title had stolen approximately $10 million from his escrow account and provided him with false documents.  Doc. 248 at ¶ 43.  Chicago Title did not conduct an investigation, though Mazer contacted a representative of A Clear Title, who denied the accusation.  *Ibid*.  No one else from Chicago Title ever contacted A Clear Title regarding this complaint.  *Ibid*.  On at least one prior occasion, when Chicago Title was notified that a title issuing agent's employee had stolen from an escrow account, Chicago Title conducted an investigation and ensured that the title issuing agent paid back the money.  *Id*. at ¶ 44.

Chicago Title had an internal Code of Business Conduct & Ethics that applied to all employees and provided ethical and professional guidelines regarding their employment. *Id*. at ¶ 45. Compliance with the Code was a condition of employment. *Ibid*. The Code imposed on every employee a duty and responsibility to report any actual or suspected illegal or unethical conduct, and it provided a fraud and ethics hotline phone number at the bottom of each page. *Ibid*. The Code stated that all employees were expected to be vigilant in discovering evidence of possible fraud or material misrepresentation, including, but not limited to, any misuse of or irregularity in handling and reporting escrow funds by any agent of Chicago Title. *Ibid*. Chicago Title does not have any other written policies or procedures concerning how employees are to handle complaints about agents mishandling or misappropriating escrow funds or how Chicago Title's Corporate Compliance Department or Legal Department would investigate suspected violations of the law. *Ibid*.

Chicago Title conducted audits of A Clear Title, which resulted in audit reports dated January 5, 2009 and January 25, 2011. *Id*. at ¶ 14. The audits included a review of escrow services, including escrow trial balance procedures, deposits and disbursements procedures, and general escrow handling procedures. *Ibid*. The auditors looked for transfers to undisclosed accounts, which included wire transfers into and out of such accounts. *Id*. at ¶ 16. In the two audits, Chicago Title reviewed transfers from a Synovus Bank escrow account, which evidenced wire transfers between A Clear Title, Bentley Equities, LLC, and Chris Hales, and wire transfers for "commission" and "real estate transaction." *Id*. at ¶¶ 16-17.

The audit that resulted in the January 25, 2011 report was commenced on November 14, 2010. *Id*. at ¶ 15. A Clear Title failed that audit, and there should have been a follow-up review within ninety days, by the end of April 2011. *Ibid*. Chicago Title never audited A Clear Title's

3462 Account as part of its audit process, despite having information that A Clear Title was "affiliated" with Fifth Third Bank and receiving information from Gondeck about that account. Doc. 245 at p. 26, ¶ 18. Chicago Title never investigated A Clear Title concerning the handling or misappropriation of escrow funds until after this lawsuit was filed in September 2011. Doc. 248 at ¶ 40. Confirmation of theft or fraudulent activity by an agent would have constituted a basis for terminating the Issuing Agency Contract. *Ibid.*

Between September 21, 2010 and December 13, 2010, Cormier did not have any ownership in A Clear Title, and A Clear Title was owned solely by Michalowska. *Id.* at ¶ 5. By the end of November 2010, the funds in the 3462 Account had been withdrawn and transferred elsewhere, and there was not sufficient money in the account to cover Plaintiffs' deposits. Doc. 245 at p. 19-20, ¶¶ 64-66. However, at various times in 2011, the daily and end-of-month balances of the 3462 Account exceeded the $500,000 that both Plaintiffs had collectively deposited with A Clear Title, and there were millions of dollars of incoming wire transfers to the 3462 Account between January 2011 and September 2011. Doc. 248 at ¶ 46.

Cormier pleaded guilty to charges of conspiracy to commit wire fraud and admitted that he fraudulently withdrew Plaintiffs' funds from the 3462 Account. *Id.* at ¶ 47. Spies had no information or belief that Harrison's financing offers to Plaintiffs were improper or potentially illegal, and Spies believed that A Clear Title was acting as Chicago Title's agent throughout the pendency of the transactions. *Id.* at ¶ 60.

## Discussion

### I. Vicarious Liability/Apparent Authority Claim

Plaintiffs allege that Chicago Title is vicariously liable for the conspiracy, common law fraud, breach of contract, breach of fiduciary duty, negligence, civil theft, and fraudulent

misrepresentation allegedly committed by A Clear Title. The vehicle for this claim is the apparent authority doctrine, under which Plaintiffs allege that Chicago Title gave A Clear Title apparent authority to act as its agent for escrow-related services, rendering Chicago Title vicariously liable for A Clear Title's misconduct. Doc. 68 at ¶¶ 152-161.

"Apparent authority arises when a principal creates, by its words or conduct, the reasonable impression in a third party that the agent has the authority to perform a certain act on its behalf." *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1065 (7th Cir. 2000) (internal quotation marks omitted). Under Illinois law, a plaintiff seeking relief under an apparent authority theory must show that: "(1) the principal consented to or knowingly acquiesced in the agent's exercise of authority; (2) based on the actions of the principal and agent, the third person reasonably concluded that the party was an agent of the principal; and (3) the third person justifiably and detrimentally relied on the agent's apparent authority." *Sphere Drake Ins. Ltd. v. Am. Gen. Life Ins. Co.*, 376 F.3d 664, 673 (7th Cir. 2004). "Only the words and conduct of the alleged principal, not the alleged agent, establish the authority of an agent," *C.A.M. Affiliates, Inc. v. First Am. Title Ins. Co.*, 715 N.E.2d 778, 783 (Ill. App. 1999), so only Chicago Title's conduct need be considered. "The existence and scope of an agency relationship," be it actual, apparent, implied, or inherent, "are questions of fact to be determined by the trier of fact [u]nless the parties['] relationship is so clear as to be undisputed." *Orix Credit Alliance, Inc. v. Taylor Mach. Works, Inc.*, 125 F.3d 468, 474 (7th Cir. 1997) (internal quotation marks omitted, alterations in original).

Chicago Title argues that Plaintiffs' apparent authority theory fails as a matter of law because Plaintiffs did not exercise reasonable diligence in determining the existence and extent of A Clear Title's authority. Specifically, Chicago Title argues that the Florida Department of

Financial Services website and the due diligence package provided by A Clear Title "were not created or disseminated by Chicago Title," Doc. 206 at 14-15, and that Plaintiffs' communications with Chicago Title employees failed to broach the nature or terms of the POF Program, *id*. at 15-16. The law underlying Chicago Title's argument is clear. "A third person dealing with a known agent may not act negligently with regard to the extent of the agent's authority or blindly trust the agent's statements in such respect. Rather, he must use reasonable diligence and prudence to ascertain whether the agent is acting and dealing with him within the scope of his powers." *Gen. Refrigeration & Plumbing Co. v. Goodwill Indus. of St. Louis, Mo.*, 333 N.E.2d 607, 611 (Ill. App. 1975); *see also Malcak v. Westchester Park Dist.,* 754 F.2d 239, 245 (7th Cir. 1985) ("[a] third party dealing with an agent has the obligation to verify both the fact and extent of the agent's authority"). "[T]he scope of the agent's authority may be ascertained by determining what persons of reasonable prudence, ordinarily familiar with business practices, in dealing with the agent might rightfully believe him to possess, based on the principals' conduct." *Mateyka v. Schroeder*, 504 N.E.2d 1289, 1295 (Ill. App. 1987); *see also Bethany Pharmacal Co. v. QVC, Inc.*, 241 F.3d 854, 860 (7th Cir. 2001); *Elmore v. Blume*, 334 N.E.2d 431, 434 (Ill. App. 1975). However, "[a]n agent's authority may be presumed from silence of the alleged principals when they knowingly allow another to act for them as their agent." *Mateyka*, 504 N.E.2d at 1295; *see also Bethany Pharmacal Co.*, 241 F.3d at 860.

In response, Plaintiffs submit that because Chicago Title knew that A Clear Title handled escrow funds and conducted closings as part of real estate transactions, A Clear Title acted as Chicago Title's apparent agent when conducting closings and handling settlement funds so long as the transaction resulted in the issuance of a title policy. Doc. 244 at 10-11. Plaintiffs also note that Chicago Title was entitled to a portion of the title insurance premium when A Clear

15

Title issued a title insurance policy. *Id.* at 11. And Plaintiffs maintain that Chicago Title's failure to disclose the limits on A Clear Title's agency or monitor A Clear Title's activities and advertising constitutes "silence" giving rise to a reasonable presumption of A Clear Title's authority. *Id.* at 11-12, 14.

The mere fact that Chicago Title issued title insurance policies for transactions in which A Clear Title participated as a closing agent does not, standing alone, make A Clear Title Chicago Title's apparent agent. *See Nat'l Mortg. Warehouse, LLC v. Bankers First Mortg. Co.*, 190 F. Supp. 2d 774, 781 (D. Md. 2002). However, the foregoing facts— including that Chicago Title knew that A Clear Title handled escrow funds as part of real estate transactions but never disclosed to the public the limitations on A Clear Title's agency; that Chicago Title provided A Clear Title with promotional materials containing Chicago Title's name that A Clear Title could provide to customers; that Chicago Title never monitored A Clear Title's promotional and advertising materials; that the due diligence package provided by A Clear Title to Plaintiffs stated that A Clear Title was underwritten by Chicago Title; that Gondeck, prior to wiring his funds, reviewed Chicago Title's website and went to a Chicago Title branch office, where a Chicago Title employee never informed him of the limitations of A Clear Title's agency, sent him a screenshot of the Florida Department of Insurance website stating that A Clear Title had "TITLE INS. AGENCY" from Chicago Title, and referred to him as a "customer" of Chicago Title; and that prior to wiring his funds, O'Malley reviewed Chicago Title's website, A Clear Title's website, the due diligence package provided by A Clear Title, and the Florida Department of Financial Services website for A Clear Title, and none of these sources disclosed any limitations on the scope of A Clear Title's agency—which at this stage are assumed true, could lead a reasonable jury to find that Plaintiffs reasonably concluded that A Clear Title was acting

as Chicago Title's agent in the POF Program and that Chicago Title's acts, omissions, and silence allowed Plaintiffs to hold that belief. *See Progress Printing Corp. v. Jane Byrne Political Comm.*, 601 N.E.2d 1055, 1067 (Ill. App. 1992) ("a third party's duty [to ascertain the scope of authority] does not obviate a principal's own duty to third parties, which is to exercise reasonable diligence in monitoring its agent's activities so that they are not exceeding their authority"). Chicago Title points to the Issuing Agency Contract's express exclusion of escrow activities from the scope of Chicago Title's and A Clear Title's relationship, but the Issuing Agency Contract was not known to Plaintiffs and thus does not undermine the apparent authority claim. *See Lundberg v. Church Farm, Inc.*, 502 N.E.2d 806, 813 (Ill. App. 1986) ("where an agent has apparent authority to act, the principal will be liable in spite of any undisclosed limitations the principal has placed on that authority"); *Sztorc v. Nw. Hosp.*, 496 N.E.2d 1200, 1201-02 (Ill. App. 1986) ("patients [third parties], who are generally unaware of the independent status of the treating physicians, should not be bound by the 'secret limitations' which are contained in a private contract between a hospital [the principal] and a doctor [the apparent agent]").

Chicago Title also contends that Plaintiffs' belief in A Clear Title's authority is unreasonable as a matter of law because the POF Program transactions were "fraudulent and implausible." Doc. 206 at 17-20. "[A]n essential element [of an apparent authority claim] is the third party's reasonable belief that the agent is acting within the authority granted by the principal, that the transaction appears to be regular and in the ordinary course of business." *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 883-84 (7th Cir. 1992). Illinois law holds that "notice to a third party of impropriety on the part of a person or entity otherwise appearing to be an agent …. negates the appearance of authority." *Lincoln Cardinal Partners v. Barrick*, 578 N.E.2d 316, 319 (Ill. App. 1991). Invoking these principles, Chicago Title argues that, "[a]t

bottom, Plaintiffs were being paid to allow [Harrison and SRV] to use [Plaintiffs'] funds to deceive lenders and investors" by mischaracterizing the temporary influx of Plaintiffs' funds as the unencumbered liquid assets of Harrison or SRV to obtain financing. Doc. 206 at 18. Thus, Chicago Title asserts, Plaintiffs knew or should have known that the POF Program fell outside the scope of A Clear Title's authority and should have exercised extra diligence in determining the extent of A Clear Title's agency. *Id*. at 20-22.

Chicago Title's argument may convince a jury, but for purposes of summary judgment, the record does not indisputably show that Plaintiffs knew that their funds would be portrayed improperly to lenders and investors as Harrison's or SRV's funds. Doc. 245 at p. 8, ¶¶ 26-27, pp. 13-14, ¶ 42; Doc. 248 at ¶ 53. Viewing the record in the light most favorable to Plaintiffs, Gondeck was not told how the proof of funds was to be used other than that it was to be held in escrow and would remain Gondeck's assets, Doc. 245 at p. 8, ¶¶ 26-27; Doc. 248 at ¶ 53, and O'Malley knew only that the proof of funds would somehow be used to secure refinancing for Harrison and SRV, not that the funds would necessarily be fraudulently portrayed as Harrison's and SRV's assets, Doc. 245 at pp. 13-14, ¶ 42; Doc. 200-5 at 53-54, 62-63. Chicago Title points to the "astronomical fees and/or funding" and "unrealistic returns" that Plaintiffs were to receive as "obvious" proof that that the POF Program fell "outside the ordinary course of any lawful business." Doc. 206 at 18-20. Again, Chicago Title's argument is not without force, and it possibly and perhaps even likely will convince a jury, but the issue is not appropriate for resolution on summary judgment. *See Rankow v. First Chicago Corp.*, 870 F.2d 356, 359 (7th Cir. 1989); *Schoenberger v. Chicago Transit Auth.*, 405 N.E.2d 1076, 1081 (Ill. App. 1980) ("Whether a person has notice of the lack of an agent's authority or is put on notice by circumstances is a question of fact."); *Hofner v. Glenn Ingram & Co.*, 489 N.E.2d 311, 316 (Ill.

App. 1985) (same); *Simmons Motor Co. v. Dudley*, 196 Ill. App. 329, 332 (Ill. App. 1915) (holding that "the question whether [the party] in dealing with such agent exercised ordinary prudence and reasonable diligence is a question of fact to be determined by the jury" and "the question whether the transaction between [the party] and such agent was of such an unusual and improbable character as to put an ordinarily prudent man on his guard is a question of fact to be determined by the jury").

Finally, Chicago Title maintains that Plaintiffs' motion for a good faith settlement finding, Doc. 143, "judicially admitted" that by the end of November 2010, O'Malley's escrow funds had been completely withdrawn from the 3462 account and that any money in the account after that date could not have been recovered by Plaintiffs. Doc. 206 at 15-16. From this premise, Chicago Title concludes that O'Malley cannot show detrimental reliance because he did not communicate with Chicago Title until February 2011 and thus "[could] not have relied upon any communication with Chicago Title in wiring his funds on November 4, 2010." *Id.* at 9. "A judicial admission is a statement … that negates a factual claim that the party making the statement might have made or considered making, and "in order to qualify as judicial admissions," the statement "must be deliberate, clear and unambiguous." *Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861, 872 (7th Cir. 2010) (internal quotation marks omitted).

Plaintiffs' motion for a good faith settlement finding falls short of judicially admitting to their inability to recover their funds after November 2010. The motion stated that "significant recovery against Fifth Third was *highly unlikely*" because between November 2010 and August 2011, "there were only two months in which the balance in the account at any given point in a month exceeded the combined $500,000.00 being sought by Plaintiffs," and that "even in that scenario, there was a *legitimate concern* that any money in the 3462 account after September

19

2010 (Gondeck) and after November 2010 (O'Malley) … could not have been recovered by these Plaintiffs because any such money belonged to others and therefore Plaintiffs were not entitled to recover that money." Doc. 143 at 5-6 (emphasis added). These statements are equivocal, stating only that recovery against Fifth Third was unlikely, and they cannot be considered a judicial admission given Plaintiff's lack of knowledge regarding whether the money in the 3462 account between November 2010 and August 2011 could be recovered. *See Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1166 (7th Cir. 1996) (holding that statements were not judicial admissions where speakers did not have "actual knowledge" and "merely had been speculating when they spoke"); *Fairbanks v. Yellow Cab Co.*, 346 F.2d 258, 259 (7th Cir. 1965) ("a judicial admission can be based only on deliberate, clear, and unequivocal statements of facts … not a matter of opinion, estimate, appearance, [or] inference") (internal quotation marks omitted); *Brummet v. Farel*, 576 N.E.2d 1232, 1234 (Ill. App. 1991) (holding that answers to interrogatories could not be treated as judicial admissions "when the party's testimony … amounts to an estimate or opinion rather than a statement of concrete fact"); *Int'l Harvester Co. v. Indus. Comm'n*, 523 N.E.2d 1303, 1306 (Ill. App. 1988) ("Testimony of a party may be binding on him or her as a judicial admission, if the matter testified to is within the party's personal knowledge, without reasonable chance of mistake, and … clear and unequivocal.") (emphasis added). The statements therefore are not judicial admissions.

For these reasons, summary judgment is denied on the vicarious liability/apparent authority claim.

## II.    Negligence Claim

Plaintiffs also allege that Chicago Title is directly liable for the harm caused them by negligently failing to monitor, supervise, or investigate A Clear Title and negligently failing to

communicate to them accurate and truthful information regarding its agency relations with A Clear Title. Doc. 68 at ¶¶ 187-197. The negligence claim fails on two separate grounds—the law does not recognize the negligence theory underlying the claim, and the economic loss doctrine bars the claim.

## A.    Plaintiffs' Negligence Theory

In *Bluehaven Funding, LLC v. First American Title Insurance Company*, 594 F.3d 1055 (8th Cir. 2010), the court rejected a negligence claim analogous to Plaintiffs' claim here. The *Bluehaven* plaintiffs loaned approximately $2.4 million to a third party for the purpose of purchasing properties to be renovated and sold, the funds were held in an escrow account at Capital Title, and all of the loan transactions were closed at Capital Title. *Id*. at 1057. Ultimately, the third party misappropriated the plaintiffs' funds, and the plaintiffs sued First American Title Insurance Company, a title insurance provider that had entered into a Policy Issuing Agency Contract with Capital Title. *Id*. at 1056. The contract appointed Capital Title as First American's agent for purposes of "transacting title insurance business," and expressly limited the scope of Capital Title's agency to "issu[ing], in the name of Principal, title insurance commitments and policies (including endorsements hereto)." *Id*. at 1056-57. The plaintiffs alleged that First American was negligent for failing "to monitor Capital Title's business, and specifically, Capital Title's escrow activities." *Id*. at 1060.

Applying Missouri law, the Eighth Circuit held that the Agency Contract did not impose any duty on First American in favor of the plaintiffs because the plaintiffs were not parties to the contract, because the contract did not "obligate First American to review Capital Title's escrow accounts and files; rather, it simply [gave] First American the right to do so 'periodically and at times to 'be determined by' First American," and because nothing in the record indicated that

First American understood that the reviews it might choose to perform would be for the benefit of third parties. *Id*. at 1060-61. The court also held that common law did not create any such duty because, "[i]mportantly, the [contract] clearly disclaimed any duty to third parties, and … Capital Title was acting outside the scope of its authority when it provided escrow and closing services to appellants." *Id*. at 1061.

The rationale and result of *Bluehaven* apply with equal force here. Like Capital Title, A Clear Title was indisputably acting outside the scope of its actual authority under the Issuing Agency Contract when it provided Plaintiffs with escrow services unrelated to title insurance services. It follows that Chicago Title thus had no tort duty to monitor or supervise A Clear Title's activities with regard its dealings to Plaintiffs. *See In re Evans*, 464 B.R. 272, 288-91 (Bankr. S.D. Miss. 2011) (holding under Mississippi law that a title insurance company owes no duty to a third party to audit, monitor, or supervise its approved attorney where the relevant insurance policy did not impose that duty).

Although there is no Illinois precedent directly on point, *Bluehaven* is consistent with Illinois law. In *Ferentchak v. Village of Frankfort*, 475 N.E.2d 822 (Ill. 1985), the Supreme Court of Illinois considered whether a defendant engineer could be held liable for the failure to establish minimum foundation grade levels for the plaintiffs' home when the engineer designed the plans for the subdivision as part of a contract with the developer, not with the plaintiffs, and the contract between the defendant and the developer did not require the engineer to set minimum foundation grade levels for each lot. *Id*. at 823. The court held the defendant did not owe a duty to the plaintiffs because the contract with the developer did not expressly provide for such a duty; the court added that no legal duty arose from the defendant's professional responsibility as a registered civil engineer because "[t]he degree of skill and care required of

[the defendant] in this situation is dependent on his contractual obligation [to the developer] …
[t]he scope of that duty, although based upon tort rather than contract, is nevertheless defined by
the contract between the engineer and the developer." *Id*. at 825-26 (internal quotation marks
and citation omitted).  Likewise, neither the Issuing Agency Contract nor Chicago Title's
professional responsibility as a title insurance provider gave rise to a duty on Chicago Title's part
to monitor or supervise A Clear Title's escrow activities or other activities outside the title-
insurance context.

It is true that the defendant engineer in *Ferentchak* was the developer's agent, while
Chicago Title was A Clear Title's alleged principal.  It thus remains conceivable that Illinois law
could chart a different course than *Bluehaven* and recognize an extracontractual duty in our
circumstances.  However, the parties have not cited and the court has not found any Illinois
authority recognizing the negligence theory advanced by Plaintiffs.  Adopting Plaintiffs' theory
in this case thus would broaden title insurers' negligence liability under Illinois law, and the
Seventh Circuit has repeatedly cautioned that "[w]hen we are faced with two opposing and
equally plausible interpretations of state law, we generally choose the narrower interpretation
which restricts liability, rather than the more expansive interpretation which creates substantially
more liability."  *Home Valu, Inc. v. Pep Boys–Manny, Moe & Jack of Del., Inc.*, 213 F.3d 960,
963 (7th Cir. 2000) (internal quotation marks omitted); *accord*, *e.g.*, *Pisciotta v. Old Nat'l
Bancorp*, 499 F.3d 629, 636 (7th Cir. 2007); *S. Ill. Riverboat Casino Cruises, Inc. v. Triangle
Insulation & Sheet Metal Co.*, 302 F.3d 667, 676 (7th Cir. 2002); *Insolia v. Philip Morris Inc.*,
216 F.3d 596, 607 (7th Cir. 2000); *Birchler v. Gehl Co.*, 88 F.3d 518, 521 (7th Cir. 1996); *Todd
v. Societe Bic, S.A.*, 21 F.3d 1402, 1412 (7th Cir. 1994) (en banc).  In the absence of Illinois

authority establishing an extracontractual duty on the part of title insurance providers under circumstances like these, the issue must be resolved in Chicago Title's favor.

Plaintiffs also claim that Chicago Title's Code of Business Conduct & Ethics gave rise to an extracontractual duty "to report and investigate any knowledge of suspicious behavior of agents, including misappropriation of escrow funds, and conduct[] audits of A Clear Title's escrow accounts."  Doc. 244 at 24.  The Code imposed on all Chicago Title employees the responsibility to report any actual or suspected illegal or unethical conduct, and stated that all employees were expected to be "vigilant" in discovering evidence of possible fraud or material misrepresentations.  Doc. 248 at ¶ 45.  However, settled Illinois precedent holds that "[w]here the law does not impose a duty, one will not generally be created by a defendant's rules or internal guidelines.  Rather, it is the law which, in the end, must say what is legally required."  *Rhodes v. Ill. Cent. Gulf R.R.*, 665 N.E.2d 1260, 1272 (Ill. 1996); *see also Asmus v. Mac's Convenience Stores, LLC*, 438 F. App'x 505, 507 (7th Cir. 2011) (holding under Illinois law that "general policies in an employee handbook are not contractual promises" that can impose a legal duty); *Shank v. H.C. Fields*, 869 N.E.2d 261, 268 (Ill. App. 2007) ("Violation of self-imposed rules or internal guidelines … do not normally impose a legal duty, let alone constitute evidence of negligence."); *Fillpot v. Midway Airlines, Inc.*, 633 N.E.2d 237, 244 (Ill. App. 1994) (declining to recognize a legal duty based on the defendant company's policy manual); *Blankenship v. Peoria Park Dist.*, 647 N.E.2d 287, 291 (Ill. App. 1994) (rejecting the plaintiff's argument that a legal duty arose from the defendant's internal rules requiring that at least one lifeguard remain on duty during the adult swim period); *Quinn v. Sigma Rho Chapter of Beta Theta Pi Fraternity*, 507 N.E.2d 1193, 1198 (Ill. App. 1987) ("a legal duty is normally not established through rules and regulations … or internal guidelines"); *Dezort v. Vill. of Hinsdale*,

342 N.E.2d 468, 472 (Ill. App. 1976) ("The failure to comply with self-imposed regulations does not necessarily impose … a legal duty … nor does the failure to comply with such regulations make a case of prima facie liability").

### B.     The Economic Loss Doctrine

Chicago Title also argues that Plaintiffs' negligence claim is defeated by the economic loss doctrine, known as the *Moorman* doctrine in Illinois, which holds, subject to certain exceptions, that "solely economic losses are generally not recoverable in tort actions." *In re Chicago Flood Litigation*, 680 N.E.2d 265, 274 (Ill. 1997); *see also Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 692-93 (7th Cir. 2011) (applying the economic loss doctrine to a negligence claim); *Rasgaitis v. Waterstone Fin. Grp., Inc.*, 985 N.E.2d 621, 636-37 (Ill. App. 2013) (same). Plaintiffs' various responses are without merit, and the economic loss doctrine provides another ground for defeating their negligence claim.

First, Plaintiffs contend that because they "did not have a contractual relationship directly with Chicago Title," the damages they seek are "not the type envisioned to be barred by the economic loss doctrine." Doc. 244 at 22. That is wrong, as settled law holds that the absence of a contractual relationship does not place a negligence claim outside the doctrine's scope. The case from which the economic loss doctrine takes its name in Illinois, *Moorman Manufacturing Company v. National Tank Company*, 435 N.E.2d 443 (Ill. 1982), defines "economic loss" as monetary loss "without any claim of personal injury or damage to other property," *id*. at 449, and observes that "where there is no accident, and no physical damage, and the only loss is a pecuniary one, through loss of the value or use of the thing sold, … the courts have adhered to the rule that purely economic interests are not entitled to protection against mere negligence, and so have denied the recovery," *id*. at 451. A more recent decision, *In re Chicago Flood*

*Litigation*, holds that, "[a]bsent injury to a plaintiff's person or property, a claim presents an economic loss not recoverable in tort." 680 N.E.2d at 276. What these decisions implicitly convey, and what subsequent decisions explicitly hold, is that coverage by the economic loss doctrine is governed not by whether the plaintiff was a party to a contract, but rather by whether the plaintiff alleges personal or property damage as opposed to simply pecuniary losses. *See Am. United Logistics, Inc. v. Catellus Dev. Corp.*, 319 F.3d 921, 926 (7th Cir. 2003) ("Recovery in tort for disappointed commercial expectations due to breach of implied duties and warranties between non-contracting parties is also barred by the economic loss doctrine."); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1140 (Ill. 2004) (noting that *In re Chicago Flood Litigation* applied the economic loss doctrine even though "there was no privity of contract between the parties"); *id.* at 1143 (holding that the doctrine applies, even absent a contractual relationship, where "the damages sought by the plaintiffs are 'solely economic damages' in the sense that they represent costs incurred in the absence of harm to a plaintiff's person or property"); *Donovan v. Cnty. of Lake*, 951 N.E.2d 1256, 1265 (Ill. App. 2011) (applying the economic loss doctrine where the plaintiffs, who were not parties to the relevant contracts, failed to allege "actual property loss that was above and beyond their disappointed commercial expectations"); *Martusciello v. JDS Homes, Inc.*, 838 N.E.2d 9, 15 (Ill. App. 2005) (rejecting the plaintiffs' argument that "they are not barred from seeking economic damages against defendants in the absence of a contract between the parties"). As the Supreme Court of Illinois explained nearly a decade ago, "[a]lthough the economic loss doctrine is rooted in the theory of freedom of contract, it has grown beyond its original contract-based policy justifications of maintaining the fundamental distinction between contract and tort and protecting the freedom of parties to allocate risk by contract." *Beretta U.S.A. Corp.*, 821 N.E.2d at 1142.

Second, assuming that the doctrine can apply absent a contractual relationship, Plaintiffs assert that the doctrine does not bar their negligence claim in its entirety because they are in fact seeking to recover "more than purely economic losses." Doc. 244 at 21. In support, they cite *Geimer v. Bank of America, N.A.*, 784 F. Supp. 2d 926 (N.D. Ill. 2011), which holds that an allegation of non-economic losses, including "embarrassment, humiliation, and emotional and mental pain and anguish," is sufficient to sustain a negligence claim against the economic loss doctrine despite the doctrine's application to the plaintiff's alleged economic losses. *Id*. at 934 n.2. However, the second amended complaint here does not allege that Chicago Title or its alleged negligence caused Plaintiffs any non-economic injuries, and Plaintiffs may not make new allegations of injury in their response to Chicago Title's summary judgment motion. *See Griffin v. Potter*, 356 F.3d 824, 830 (7th Cir. 2004) ("Griffin never alleged in her complaint that the Postal Service has withheld raises from her, and she could not amend her complaint through allegations made in response to a motion for summary judgment."); *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002) ("Although it is true that Grayson argued in opposition to summary judgment that the Service retaliated against him for filing EEOC complaints, a plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.") (internal quotation marks omitted); *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 492 (N.D.N.Y. 2009) ("In his Opposition Memorandum of Law, Plaintiff alleges for the first time that the harassment caused him to experience 'humiliation[,] … [and] *extreme* feelings of marginality and "nobodiness."' … As an initial matter, I note that, while special solicitude permits a *pro se* plaintiff to effectively amend the allegations of his complaint while responding to a motion to dismiss … it does *not* permit him to do so while responding to a motion for summary judgment (which, typically, comes relatively late in an action, for example, where, as

here, after the defendants have completed discovery based on the allegations contained in the plaintiff's complaint).") (alterations in original); *Shabazz v. Pico*, 994 F. Supp. 460, 474 (S.D.N.Y. 1998) (refusing to allow the plaintiff to assert new claims of physical injury in his response to the defendants' summary judgment motion where the complaint failed to allege anything more than verbal abuse by the defendants).

Third, Plaintiffs argue that the economic loss doctrine is inapplicable because Chicago Title breached an extracontractual duty to monitor and supervise A Clear Title and to investigate the complaints it received regarding A Clear Title. Doc. 244 at 21-22. The argument is without merit. It is true that *Congregation of the Passion v. Touche Ross & Co.*, 636 N.E.2d 503 (Ill. 1994), held that the doctrine did not bar a tort claim against an accounting firm because accountants, like lawyers, have an extracontractual duty to their clients to observe reasonable professional competence that exists independently of any contract, and "[w]here a duty arises outside of the contract, the economic loss doctrine does not prohibit recovery in tort for the negligent breach of that duty." *Id*. at 514. The key to *Congregation of the Passion*, however, is the professional relationship under which an accountant provides services to her client, which the Supreme Court of Illinois likened to the professional relationship under which an attorney provides services to her client. *Id*. at 515 ("This duty to observe reasonable professional competence exists independently of any contract."). The relationship (if it could even be called that) between Chicago Title and Plaintiffs was not a professional relationship, and did not entail the provision of services by Chicago Title to Plaintiffs. That serves to distinguish *Congregation of the Passion*, and Plaintiffs fail to cite to any authority to support the proposition that title insurance providers like Chicago Title have a relationship with their agents' clients under circumstances where the agents are acting outside of the scope of the actual agency relationship.

Fourth, Plaintiffs analogize this case to *Mutual Service Casualty Insurance Company v. Elizabeth State Bank*, 265 F.3d 601 (7th Cir. 2001). *Mutual Service* considered whether the economic loss doctrine barred a tort claim against a bank brought by an insurer that had paid the loss arising out of an embezzlement by the insured's employee, who had obtained payment on checks that the insured's manager had drawn to the order of the bank. *Id*. at 606-08. *Mutual Service* is inapposite because, as shown above, Chicago Title did not owe Plaintiffs an extracontractual, common law tort duty to supervise or monitor their title insurance agents' other activities.

Fifth, Plaintiffs argue that their negligence claim falls under the negligent misrepresentation exception to the economic loss doctrine. Doc. 244 at 23-24. Illinois law recognizes three exceptions to the doctrine, one of which applies "where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions." *Catalan*, 629 F.3d at 693 (internal quotation marks omitted). Plaintiffs argue that "Chicago Title under these circumstances, particularly with [respect] to Gondeck, was in the business of supplying information for the guidance of others in their business transactions." Doc. 244 at 23. The argument fails to persuade.

Whether a party is "in the business of supplying information" for purposes of a negligent misrepresentation claim is a question of law to be determined by the court. *See Instituto Nacional De Comercializacion Agricola (Indeca) v. Cont'l Ill. Nat'l Bank & Trust Co.*, 858 F.2d 1264, 1267 (7th Cir. 1988). Two requirements must be met: "First, the defendant must supply the information in the course of his business and second, the information must be supplied for the guidance of others in their business transactions … with *third* parties." *Rankow*, 870 F.2d at

362-63.  Illinois courts have strictly applied the "in the course of his business" requirement, holding that defendants who are sellers of tangible products or services are not in the business of supplying information to others even where they provide the plaintiff with information "in the course of" the business that they conduct.  *See Orix Credit Alliance, Inc.*, 125 F.3d at 475 ("Courts have consistently held that manufacturers of tangible noninformational goods … are not in the business of supplying information."); *Fox Assocs., Inc. v. Robert Half Int'l, Inc.*, 777 N.E.2d 603, 607 (Ill. App. 2002); *Tan v. Boyke*, 508 N.E.2d 390, 396 (Ill. App. 1987) (holding that the defendant builder, owner, and manager of apartment buildings was not in the business of supplying information to others even though the defendant provided information to the plaintiff in the course of a transaction to sell the apartment buildings); *Knox Coll. v. Celotex Corp.*, 453 N.E.2d 8, 11 (Ill. App. 1983) ("defendant here is not engaged in the business of supplying information but is simply a manufacturer and seller of roofing materials").  The information offered by such defendants "relates to the defendant's tangible goods and/or noninformational goods or services, [and thus] the information is considered merely ancillary or incidental, and the defendant is not deemed to be in the business of providing information and is not liable for negligent misrepresentation."  *First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 823 N.E.2d 168, 179 (Ill. App. 2005); *see also Rankow*, 870 F.2d at 363-64 ("Obviously a great many business involve an exchange of information as well as of tangible products—manufacturers provide operating or assembly instructions, and sellers provide warranty information of various kinds.  But if we ask what the product is in each of these cases, it becomes clear that the product … is not itself information, and that the information provided is merely incidental.").

Chicago Title is a provider of title insurance and escrow services.  Doc. 245 at 2, ¶ 3.  An insurance policy is "a noninformational product" for purposes of the economic loss doctrine.

*Gerdes v. John Hancock Mut. Life Ins. Co.*, 712 F. Supp. 692, 700 (N.D. Ill. 1989) (Illinois law); *see also First Midwest Bank*, 843 N.E.2d at 336 ("We conclude, therefore, that a title insurer is not in the business of supplying information when it issues a title commitment or a policy of title insurance"). And while "[an] analogical argument could be made that … escrow services are more like 'wise counsel' than a [tangible] blueprint," *Choi v. Chase Manhattan Mortgage Co.*, 63 F. Supp. 2d 874, 890 (N.D. Ill. 1999), it is clear that in this case, even construing all facts as favorably as possible to Plaintiffs, Chicago Title was in the business of supplying insurance policies and its escrow services were incidental to the provision of such policies. Doc. 248 at ¶ 3; *see Rankow*, 870 F.2d at 361 ("[a] precise, case-specific inquiry is required to determine whether a particular enterprise is in the business of supplying information") (internal quotation marks omitted). As a title insurer, Chicago Title was not in the business of supplying information for the guidance of others in their business transactions, and the exception to the economic loss doctrine does not apply.

## Conclusion

For the foregoing reasons, Chicago Title's motion for summary judgment is granted as to the negligence claim and denied as to the vicarious liability/apparent authority claim.

June 9, 2014

_____
United States District Judge